UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Sandra Collins,

      Plaintiff,

v.                               Case No.  16-12306

United States of America,           Sean F. Cox
                                       United States District Court Judge

      Defendant.
_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      Plaintiff filed this action against Defendant United States of America, under the Federal

Tort Claims Act, after she was hit by a United States Postal Service truck.  In order to be able to

recover noneconomic damages under Michigan's No-Fault Act, Plaintiff has to show that she

suffered a serious impairment of a body function.  After the close of discovery, Defendant filed

this motion for summary judgment, asserting that Plaintiff cannot make the required threshold

showing because Plaintiff is currently, several years after the accident, able to live her normal

life.  The Michigan Supreme Court has held that a serious impairment of body function does not

need to be permanent in order to meet the threshold and that there is no express temporal

requirement as to how long an impairment must last in order to have an effect on the person's

general ability to live his or her normal life.  As explained below, this Court concludes that,

construing the evidence in the light most favorable to Plaintiff, she has created a genuine issue of

fact as to the disputed prong of whether the impairment affects the person's general ability to

lead his or her normal life.  As such, the Court shall DENY Defendant's Motion for Summary

1

Judgment and this matter shall proceed to trial.

## BACKGROUND

On June 22, 2016, Plaintiff Sandra Collins ("Plaintiff" or "Collins") filed this action against Defendant United States of America ("Defendant") under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*. Plaintiff asserts one count: "Count I: Federal Tort Claims Act – Negligence" that stems from an accident that occurred on November 19, 2013, when Plaintiff was struck by a U.S. Postal Service truck.

Following the close of discovery, on August 2, 2017, Defendant filed a Motion for Summary Judgment.

This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(D.E. No. 7 at 2-3).

In compliance with this Court's guidelines, in support of its Motion for Summary

Judgment, Defendant filed a "Statement of Material Facts Not In Dispute" ("Def.'s Stmt.). In response to that submission, Plaintiff filed a "Counter-Statement of Disputed Facts" (Pl.'s Stmt.").

The following material facts are gleaned from the evidence submitted by the parties, *viewed in the light most favorable to Plaintiff*, the non-moving party.

**It Is Undisputed That Plaintiff Was Hit By A USPS Truck On November 19, 2013.**

Plaintiff Sandra Collins is a 75-year-old widowed retiree who resides at 26241 Meadowbrook Way, Lathrup Village, Michigan. Plaintiff brought suit under the Federal Tort Claims Act, asserting that a United States Postal Service ("USPS") vehicle struck her on November 19, 2013, at approximately 5:19 p.m., while she was waiting to collect her neighbor's mail. USPS letter carrier Peter Flannery was driving a standard mail truck known as a Long Life Vehicle or LLV. Flannery was a federal employee acting in the course and scope of his employment and therefore, pursuant to the FTCA, the United States is the proper defendant in this matter. 28 U.S.C. § 2679(b)(1); 28 U.S.C. § 1346(b). Flannery, now 59 and retired, had delivered mail on Meadowbrook Way for 32 years prior to the accident and had known Plaintiff and her family for decades. (Def.'s & Pl.'s Stmts. at ¶¶ 1-5).

On the date of the accident, Plaintiff was standing at the end of her driveway at 26241 Meadowbrook Way, waiting for the mail as Flannery delivered his route. Flannery stopped parallel to Plaintiff and handed her mail to her. Flannery was able to hand the mail directly to Plaintiff because the mail truck is a right-hand drive vehicle. Flannery then drove to the next mailbox, which served Plaintiff' next-door neighbor at 26231 Meadowbrook Way. Flannery stopped at the box, sorted the mail for 26231 Meadowbrook Way and put in the box. (Def.'s &

3

Pl.'s Stmts. at ¶¶ 6-10).

While Flannery was delivering the mail to 26231 Meadowbrook Way, Plaintiff decided to pick up the mail for her neighbor who lived at 26223 Meadowbrook Way. Plaintiff had previously agreed to pick up the mail. Rather than walking on the sidewalk, Plaintiff then walked up the middle of the street, on the left-hand side of the mail truck. (Def.'s & Pl.'s Stmts. at ¶¶ 11-13).

After he completed delivering the mail to 26231 Meadowbrook Way, Flannery began driving up the street to deliver mail to 26223 Meadowbrook Way. (*Id.* at ¶¶ 15-16).

It is undisputed that Flannery's truck then struck Plaintiff. Because the parties agree that there are genuine issues of fact for trial as liability and allocation of fault for the accident, it is not necessary for the Court to address the various facts relating to how the accident happened. For purposes of the pending motion, what matters is what happened after the accident.

**Plaintiff Was Hospitalized For 12 Days After The Accident.**

The Southfield Fire Department EMS transported Plaintiff to Beaumont Royal Oak Hospital, where she arrived at the Emergency Room at approximately 6:08 p.m. and was evaluated for her injuries. Examinations and medical imaging, including X-rays and CT scans, showed the following injuries: 1) Fracture of the right superior and inferior pubic ramus (fractured pelvis) 2) Right distal fibula fracture (fractured right leg); 3) Left scapular fracture (fractured left scapula); 4) Fifth metacarpal fracture (fractured right hand); 5) Fractures of the 8th through 11th ribs (four fractured ribs); 6) Right nondisplaced sacral fracture; 7) Right transverse process fracture; and 8) Abrasions on her right knee. (Def.'s & Pl.'s Stmts. at ¶¶ 36-37).

Plaintiff also had three superficial facial lacerations that were closed with stitches: a 1

centimeter laceration on her left lip (two sutures, left infra labial), a .5 millimeter laceration on her right lip (one suture, right infra labial), and a 1 centimeter laceration over her left eye (two sutures, left lateral supraorbital ridge).  Plaintiff was also prescribed various pain medications. Her right wrist and right leg were placed in casts.  (Def.'s & Pl.'s Stmts. at ¶¶ 38-39).

The hospital records noted that Plaintiff "is widowed with no local family, previously fully independent, social work consult recommended."  (Pl.'s Ex. B at Pg ID 297).

Four days after admission, November 22, 2013, Plaintiff was evaluated for, and began, physical therapy at the hospital. Plaintiff was discharged to a rehabilitation center on December 2, 2013.  (Def.'s & Pl.'s Stmts. at ¶¶ 40-41).

### For Approximately A Month Plaintiff Then Remained Bed-Ridden In A Rehabilitation Facility.

Upon discharge from the hospital, Plaintiff received case management services from Feinberg Consulting to coordinate her ongoing medical care.  Plaintiff was transferred to the West Bloomfield Nursing Center on December 2, 2013, for additional recovery and physical and occupational therapy.  Her right wrist and right leg remained in casts.  Plaintiff had the cast on her right leg removed during an orthopedic appointment on December 17, 2013, after which she returned to the nursing center.  (Def.'s & Pl.'s Stmts. at ¶¶ 42-45).

Plaintiff testified that she was bedridden the entire time that she was hospitalized and in the rehabilitation facility, and had to use a bedpan.  (Pl.'s Dep. at 50-51).

Plaintiff was discharged to her home upon her request on December 28, 2013, despite a recommendation from the rehabilitation center staff that she stay an additional week for physical therapy.  (*Id*. at ¶ 46).

### Plaintiff Also Had Hand Surgery That Required A Surgical Pin And Wire.

After examining Plaintiff on December 17, 2013, orthopedist Dr. Jason Sadowski concluded that the fifth metacarpal fracture was not healing and scheduled surgical repair of the fracture.  Plaintiff returned to Beaumont Royal Oak Hospital on December 23, 2013, where outpatient surgery was successfully performed by Dr. Sadowski to insert a surgical pin and wire to stabilize and repair the fifth metacarpal fracture.  Dr. Sadowski used a fluoroscope to confirm alignment of the fracture, good position of the implant and no complications of the implant.  The surgical pin was removed on January 21, 2014.  (Def.'s & Pl.'s Stmts. at ¶¶ 47-50).

> **After She Returned Home, Plaintiff Required At-Home Care, At-Home Physical And Occupational Therapy,  Transportation Services, And Other Services, That Were Managed By Feinberg Consulting Until July 23, 2014.**

After Plaintiff returned home, Feinberg Consulting, Inc. oversaw her care.  A Feinberg Consulting case manager attended many of Plaintiff's medical appointments, coordinated payments for physician services and medical equipment, and documented her recovery after discharge to her home.  (Def.'s & Pl.'s Stmts. at ¶ 51).

In a January 8, 2014 report, Feinberg Consulting stated that Plaintiff was living at home alone and was using a walker with a right arm platform.  (*Id.* at 52; Def.;s Ex. 9 at Pg ID 196).  It also noted that Plaintiff was receiving both occupational therapy and physical therapy and that she 'has 3 hours of attendant care 2x/week to supervise and assist her with her activities of daily living.  Mrs. Plaintiff is unable to drive at this time and transportation has been arranged for her to get to her doctor's appointments."  (*Id.*).

In a February 7, 2014 report, Feinberg Consulting stated that Plaintiff was "no longer receiving caregiving services, per her request," because she "is able to complete all of her activities of daily living."  (Def.'s & Pl.'s Stmts. at ¶ 54; Def.'s Ex. 9).  It also noted that

Plaintiff was "transitioning from her walker to independent ambulation," and stated she was "walking in her home 50% with her walker and 50% independently," and was still receiving physical therapy for her lower extremities as well as her right hand. It noted that Plaintiff had requested a "bedside commode that she wants to place over her master bathroom toilet as she cannot get up from the commode without it." (*Id*.). It also noted that Plaintiff "is not driving at this time due to severe weather and the road conditions." (*Id*.).

In a March 11, 2014 report, Feinberg Consulting stated that Plaintiff was walking independently with "occasional complaints of pain in her groin and ankle controlled by pain medication. She is independent in her activities of daily living" but was still receiving physical therapy. (Def.'s & Pl.'s Stmts. at ¶¶ 57-58; Def.'s Ex. 9).

By May, Plaintiff was reported as driving and accomplishing all of her activities of daily living and functional activities of daily living. (Def.'s & Pl.'s Stmts. at ¶ 59).

Feinberg Consulting continued providing services until July 23, 2014. (Def.'s & Pl.'s Stmts. at ¶ 61).

In terms of durable medical equipment and injury-related home/vehicle modifications, Feinberg Consulting's records indicate Plaintiff required: 1) a right arm platform walker; 2) a walker tray; 3) a shower transfer bench; 4) a hand held showerhead; 5) a right functional walking boot; 6) a platform walker; 7) a bedside commode; and 8) entry/exit railing and steps for her home. (Def.'s Ex. P. at Pg ID 203).

**Plaintiff Also Received Outpatient Physical Therapy Until June 27, 2014.**

Plaintiff participated in a physical therapy assessment at Advance Physical Therapy on April 3, 2014. She attended that physical therapy roughly twice a week between April 3, 2014

and June 27, 2014, for treatment consisting of therapeutic exercises, lower extremity

strengthening, lower extremity flexibility, and patient education in a home exercise program.

(Def.'s & Pl.'s Stmts. at ¶ 62).  The discharge summary noted that Plaintiff had a normal gait

pattern, and that her lower extremities had normal range of motion and functional limits.  (*Id*. at

¶ 63).

> **The November 2013 Accident May Have Exacerbated Plaintiff's Pre-existing Hip
> Problems And After The Accident She Had Severe Pain And Periods Of Immobility,
> Which Caused Her To Have Total Hip Replacement Surgery In March Of 2017.**

Plaintiff has a history of right hip and pelvic/groin pain dating back to 2007, and had

been diagnosed with osteoarthritis in her right hip.  (Def.'s & Pl.'s Stmts. at ¶ 64).  In 2007,

Plaintiff had reported "noticing changes in her ability to get in and out of a seat position, go up

and down stairs, and change her shoes and socks." (Def.'s Ex. 10).  Back in 2007, her doctor

opined that Plaintiff "is clearly not at the point where I could encourage her to pursue hip

replacement surgery," and discussed other options like exercise and the use of anti-inflammatory

medications.  (*Id*).

After the accident, in February of 2017, Plaintiff was evaluated for hip pain by Dr. James

Verner.  (Def.'s Ex. 10).  Dr. Varner noted that Plaintiff reported she was having "pain on a daily

basis and suffered an especially a severe setback after walking vigorously on a treadmill in the

fall of 2016.  She is having more frequent exacerbations at this point without any significant

activity" and was wondering about hip replacement surgery now.  (*Id*.).

Plaintiff testified that she and her treating physician both believe that the accident

exacerbated her hip problems.  (Plaintiff Dep. at 82).

Plaintiff testified that, from the accident until she had hip surgery, she experienced severe

pain and, at various times, immobility:

> Q.  So let's take them one at a time. What sort of pain do you have today related to your pelvis?
>
> A.  Well, it was really, it was so bad, and that's why I had gone to the orthopedic surgeon, and he said that I – well, he didn't say it, it was up to me, but there was one time that I couldn't walk, I couldn't stand. Couldn't sit. It was unbearable. And it was very frightening, because I live alone. That's when we decided that I should have hip replacement, and he said that definitely the fractured pelvis had exacerbated the situation.
>
> Q.  You had just referenced the time where you had a lot of difficulty because of pain due to your pelvis, correct?
>
> A.  Right.
>
> Q.  You said you couldn't stand. Do you remember when that happened?
>
> A.  I, I all of this happened, like, from the accident on, and it just, it was there, and I always knew it was there, and like it was just getting worse as time went on. Like when I drove, getting in and out of the car, sometimes it would lock, and I'd tell myself, you have to get out of the car. And so it was from the accident.
>
> Q.  I'm not questioning that. I was just trying to determine if there was one particular moment where, you had mentioned you couldn't get up, if there was one particular moment that caused you to go to the orthopedist and, if so, when did that happen?
>
> A.  I'm trying to think. I'm not exactly sure. It might have been a month or two before that it scared me, because I literally could not walk or sit or stand. It was very frightening for me.
>
> Q.  You were only comfortable doing what?
>
> A.  Actually, I couldn't do anything, and that's what scared me. So I got some ice and I laid down, and as long as I didn't move, I was fine. Then that's when I thought, you can't live like this, because it was that frightening to me, so I called. I made an appointment with the orthopedist surgeon.
>
> Q.  Do you recall when the first appointment was?
>
> A.  I'm not sure. Possibly a couple months before I had the surgery . . .

(Pl.'s Dep. at 42-44).

Plaintiff decided to pursue hip replacement and had that surgery on March 24, 2017.

(Def.'s Ex. 10 at Pg ID 207). The surgeon's report stated that Plaintiff had "previous pelvic crush injury, which resulted in right hip arthropathy over time." (*Id.*).

In connection with this litigation, Dr. Cheryl Lerchin conducted an independent medical

examination. Dr. Lerchin's report noted that Plaintiff complained of "[r]ight pelvic region pain with some occasional right lower extremity throbbing, occasional left scapular region pain and occasional stiffness of the right hand." (Def.'s Ex. 12). Dr. Lerchin opined that Plaintiff "obviously incurred multi-trauma with multiple fractures. Additionally, she likely incurred an exacerbation and acceleration of preexisting osteoarthritis of the right hip possibly leading to an earlier than otherwise expected right total hip replacement." (Def.'s Ex. 12). Dr. Lerchin also stated that while Plaintiff was doing functionally well during her examination, "[i]t is possible that in the future she will experience accelerated posttraumatic arthritis and require short return courses of physical therapy." (*Id.*).

### During This Litigation, Plaintiff Testified That Even After The Hip Replacement Surgery She Still Has Pain, Which Limits Some Of Her Activities.

During her June 8, 2017 deposition in this action, Plaintiff testified that, even after the hip replacement surgery, she still has pain and problems relating to her pelvis. (Pl.'s Dep. at 42). She testified that while it has improved, she still has pain. (*Id*. at 45). She testified that "it is starting to get better" and testified that her ability to stand has improved. (*Id*. at 58). Her walking has improved since the surgery but she still walks slower and is unsure if she can walk the same distances she did prior to the accident. (*Id*. at 74-75).

Plaintiff currently lives on her own and does not require a walker in order to walk. (*Id*. at 55 & 65). She is able to bathe herself and walk up the stairs in her home. (*Id*. at 56 & 60). She can dress and feed herself without assistance and is able to drive a car. (*Id*. at 61 & 63)

Plaintiff still has someone come to her home once a month to clean her house "because I still have trouble." (*Id*. at 57). For example, she cannot bend over to clean toilets. (*Id*. at 79). She testified that she still has decreased grip strength in her right hand and that it is more

difficult to do tasks like put plates away and carry things.  (*Id*. at 74 & 77).

Plaintiff also testified that she can no longer get down on the ground, like to grab something from underneath a bed, because she does not think she would be able to get up without assistance.  (*Id*. at 79).  She also testified that her ability to sleep has declined since the accident and that she still has trouble sleeping.  (*Id*. at 62).

Plaintiff testified that her adult children live out of state and that she visits them less often now than she did before the accident.  (*Id*. at 80).  She has been nervous about her ability to sit for long periods of time.  (*Id*. at 67).  Before the accident, Plaintiff could shoot baskets with her grandson but cannot do that now.  (*Id*. at 81).

## ANALYSIS

Under the Federal Tort Claims Act, liability "is usually determined by referencing state law."  *Premo v. United States,* 599 F.3d 540, 545 (6th Cir. 2010).  The damages sought by Plaintiff in this case include non-economic damages arising out of the accident and, as a result, the Court looks to Michigan's No-Fault Act.  *Id.*

The Government's Motion for Summary Judgment contends that Plaintiff's claim fails as a matter of law because she cannot meet the serious impairment threshold required to recover noneconomic damages.[1]

## I.      The Governing Standard

Under its no-fault insurance scheme, Michigan has partially abolished tort liability for

---

[1]The motion also contains a section addressing liability for the accident, but concedes there are questions of fact for trial as to liability and allocation of fault.  (*See* Def.'s Br. at 12-15).  Plaintiff agrees and, therefore, the Court need not address those issues.

noneconomic damages arising out of automobile accidents. *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 571 (6th Cir. 2008). By statute, a plaintiff's recovery for such damages is limited to accidents in which the plaintiff "has suffered death, serious impairment of body function, or permanent disfigurement." Mich. Comp. Laws § 500.3135(1). The statute defines "serious impairment of body function" as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." Mich. Comp. Laws § 500.3135(5).

The statute provides that the issue "of whether the injured person has suffered serious impairment of body function" is a "question[ ] of law for the court if the court finds either of the following:" 1) that "[t]here is no factual dispute concerning the nature and extent of the person's injuries;" or 2) that "[t]here is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination whether the person has suffered a serious impairment of body function or permanent serious disfigurement." Mich. Comp. Laws § 500.3135(2)(a).

In *McCormick v. Carrier*, 487 Mich. 180 (2010), the Michigan Supreme Court overruled *Kreiner v. Fischer*, 471 Mich. 109 (2004), "which was then the leading case regarding the No Fault Act." *Barlow v. Adams,* 398 F. App'x 164 (6th Cir. 2010).

In *McCormick*, the Michigan Supreme Court began by explaining that "[u]nder the plain language of the statute, the threshold question whether the person has suffered a serious impairment of body function should be determined by the court as a matter of law as long as there is no factual dispute regarding 'the nature and extent of the person's injuries' that is material to determining whether the threshold standards are met." *McCormick*, 487 Mich. at

193. "If there is a material factual dispute regarding the nature and extent of the person's injuries, the court should not decide the issue as a matter of law" and "notably, the disputed fact does not need to be outcome determinative in order to be material." *Id*.

A plaintiff seeking to establish that she has suffered a serious impairment of body function must demonstrate: 1) an objectively manifested impairment; 2) of an important body function that; 3) affects the person's general ability to lead his or her normal life. *McCormick*, 487 Mich. at 195.

## A.    Objectively Manifested Impairment

"Under the first prong, it must be established that the injured person has suffered an objectively manifested impairment of body function," meaning an impairment of body function that is observable or perceivable from actual symptoms or conditions. *McCormick*, 487 Mich. at 196.

## B.    Important Body Function

The objectively manifested impairment of body function must also be one that is important. "Whether a body function has great 'value,' 'significance' or 'consequence' will vary depending on the person. Therefore, this prong is an inherently subjective inquiry that must be decided on a case-by-case basis, because what may seem to be a trivial body function for most people may be subjectively important to some, depending on the relationship of that function to the person's life." *McCormick*, 487 Mich. at 199.

## C.    Affects Persons General Ability To Lead His Or Her Normal Life

"Finally, if the injured person has suffered an objectively manifested impairment of body

function, and that body function is important to that person, then the court must determine whether the impairment 'affects the person's general ability to lead his or her normal life." *McCormick*, 487 Mich. at 200. To "affect the person's ability to lead his or her normal life," "is to have an influence on some of the person's capacity to live in his or her normal manner of living." *Id.* at 202. "Determining the effect or influence that the impairment has had on a plaintiff's ability to lead a normal life necessarily requires a comparison of the plaintiff's life before and after the incident," but the *McCormick* Court stressed that there three points to note regarding that comparison. *Id.*

"First, the statute merely requires that a person's general ability to lead his or her normal life has been affected, not destroyed. Thus, courts should consider not only whether the impairment has led the person to completely cease a pre-incident activity or lifestyle element, but also whether, although a person is able to lead his or her pre-incident normal life, the person's general ability to do so was nonetheless affected." *Id.*

Second, "there is no quantitative minimum as to the percentage of a person's normal manner of living that must be affected." *Id.* at 202.

"Third, and finally," and most important as it relates to the motion before this Court, the Michigan Supreme Court held that "the statute does not create an express temporal requirement as to how long an impairment must last in order to have an effect on 'the person's general ability to live his or her normal life.'" *Id.* It explained:

> To begin with, there is no such requirement in the plain language of the statute. Further, MCL 500.3135(1) provides that the threshold for liability is met "if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." While the Legislature required that a "serious disfigurement" be "permanent," it did not impose the same restriction on a "serious impairment of body function." Finally, to the extent that this prong's

language reflects a legislative intent to adopt this portion of *Cassidy* in some measure, *Cassidy* expressly rejected a requirement of permanency to meet the serious impairment threshold. *Cassidy,* 415 Mich. at 505–506, 330 N.W.2d 22 (noting that "two broken bones, 18 days of hospitalization, 7 months of wearing casts during which dizzy spells further affected his mobility, and at least a minor residual effect one and one-half years later are sufficiently serious to meet the threshold requirement of serious impairment of body function").

*Id*. at 203.

## II.     The Parties' Positions

In seeking summary judgment in its favor, Defendant's motion argues that Plaintiff's "claim fails as a matter of law because she cannot meet the serious impairment threshold required to recover noneconomic damages." (Def.'s Motion at 15). More specifically, it argues that she cannot show that her normal manner of living has been changed by the accident because she testified "that she is *currently* recovered and living the same life *today* that she lived prior to the accident." (*Id*. at 18) (emphasis added).

In support of its motion, Defendants directs the Court to several cases wherein a court has found that a plaintiff had not established the third prong. But none of the cases that Defendant directs the Court to in support of its motion contain facts analogous to those here.

In response to Defendant's motion, Plaintiff argues that Defendant is ignoring the Michigan Supreme Court's directive that there is no temporal requirement as to how long an impairment must last in order to have an effect on the person's ability to live his or her normal life. Defendant asserts that the facts here are akin to the facts in *Cassidy,* which was provided as an example in the *McCormick* opinion as to when injuries are sufficiently serious to meet the threshold requirement of serious impairment of body function.

Plaintiff argues that, similar to the facts in *Cassidy*, construing the evidence in the light

most favorable to her, she:

> suffered 10 broken bones including a crushed pelvis and 4 fractured ribs, required 14 days of hospitalization and 3 more weeks of skilled nursing inpatient care, and had greatly restricted mobility for several months at home. To this date, Ms. Collins feels the residual effects of being struck by a mail truck. Considering her age of 75 years, these residual effects are far from minor for Ms. Collins. In addition, the pelvic fracture exacerbated her hip arthritis to the point where she needed hip replacement surgery.

(Pl.'s Resp. at 14-15). Plaintiff also notes that her facts are analogous to those in *McCormick*, and directs the Court to several other cases in support of her position.

## III. Application Of The Standard

While many facts are undisputed in this case, there appear to be at least some factual disputes regarding the nature and extent of some of Plaintiff's injuries. For example, there are disputes as to whether the accident exacerbated Plaintiff's pre-existing hip problems and led to her having to get hip replacement surgery.

The Court agrees with Plaintiff that, construing the evidence in the light most favorable to her, she has created an issue of fact as to whether she can make the requisite showing needed to proceed with a claim for noneconomic damages under Michigan law.

Defendant appears to only contest Plaintiff's ability to establish the third prong of the serious impairment test (ie., that the impairment affects her ability to lead her normal life). Nevertheless, the Court will address all prongs.

With regard to the first prong, Plaintiff has shown an objectively manifested impairment of body function. It is undisputed that Plaintiff sustained the following injuries: 1) Fracture of the right superior and inferior pubic ramus (fractured pelvis) 2) Right distal fibula fracture (fractured right leg); 3) Left scapular fracture (fractured left scapula); 4) Fifth metacarpal

fracture (fractured right hand); 5) Fractures of the 8th through 11th ribs (four fractured ribs); 6) Right nondisplaced sacral fracture; 7) Right transverse process fracture; and 8) Abrasions on her right knee.  Those injuries left Plaintiff bedridden, in either the hospital or an in-patient rehabilitation facility, for over a month. Someone else would clearly perceive those injuries as impairing body functions, such as walking and moving.  This prong is met.

As to the second prong, the impaired body functions were important to Plaintiff, who at the time of the accident was a 75-year old retired widow with no local family, who lived independently in her own home.  Being unable to walk or move were of consequence to her ability to live independently.  Thus, the second prong is met.

The prong that Defendant does dispute is Plaintiff's ability to meet the third prong – that the impairment affects the person's general ability to lead his or her normal life.  This Court concludes that, construing the evidence in the light most favorable to Plaintiff, she has created a genuine issue of fact for trial as to this final prong.

Again, in *Cassidy* "two broken bones, 18 days of hospitalization, 7 months of wearing casts" and "at least a minor residual effect one and one-half years later" were found to be "sufficiently serious to meet the threshold requirement."  *McCormick, supra,* at 203.

In *McCormick*, the Court found that the serious impairment threshold was met as a matter of law where it was undisputed that the "plaintiff suffered a broken ankle, was completely restricted from bearing weight on his ankle for a month, and underwent two surgeries over a 10-month period and multiple months of physical therapy."  *McCormick*, 487 Mich. at 216.  The parties disputed "the extent to which plaintiff continues to suffer a residual impairment and the potential for increased susceptibility to degenerative arthritis."  But notably, "because plaintiff

has not alleged that the residual impairment, to the extent that it exists, continues to affect his general ability to lead his pre-incident 'normal life,' the Court concluded that dispute did not prevent it from deciding the issue in the plaintiff's favor as a matter of law. *Id.* at 217. Thus, it appears that the residual effects were not necessary to the finding.

Here, prior to the accident, Plaintiff was a 75-year old retired widow, with no local family, who was living entirely independently in her own home. She drove her car, maintained her own home, did some volunteer work, and even shot baskets with her grandson.

As a result of the November 19, 2013 accident, however, Plaintiff sustained multiple fractured bones from the accident, including a fractured pelvis, right leg, and right hand. Her wrist and leg were both placed in casts. For approximately a month and a half Plaintiff remained bed-ridden, in either the hospital or an in-patient rehabilitation facility. She required hand surgery that required a surgical pin and wire. She required both physical and occupational therapy, on both an in-patient and out-patient basis.

Even after Plaintiff was able to return to her own home, she required at-home care, including attendant care to supervise her and assist with activities of daily living and transportation services because she could not drive. For months, she had to use a walker, and she had to use a bedside commode because she could not get up and down by herself. She did not cease receiving physical therapy following the November 19, 2013 accident until June 27, 2014.

But even after that time, Plaintiff continued to experience problems with her hips and mobility. Plaintiff has submitted evidence that the accident exacerbated her pre-existing hip problems, which ultimately caused her to have a total hip replacement in March of 2017 –

several years after the accident. She testified that prior to the surgery she had unbearable pain and at times could not walk or even stand.

And while Plaintiff's walking and mobility has improved following the hip replacement surgery, she still has at least some residual effects. She still walks slower than she did before the accident and she cannot do things like get down on the ground to retrieve something from the floor. She has decreased grip strength that makes various tasks more difficult. While Plaintiff lives independently in her own home, she has someone come clean once a month. In addition, the physician who performed an IME on Plaintiff on July 14, 2017, opined that in the future Plaintiff may experience accelerated posttraumatic arthritis that may require additional physical therapy.

Accordingly, this Court concludes that Plaintiff has created an issue of fact as to whether Plaintiff was able to lead her normal life after the accident. *McCormick, supra; Cassidy, supra*; *see also Dybas v. Madziar,* 2011 WL 1327856 (Mich. App. 2011) (finding issue of fact even though "plaintiff's doctor indicated that he expected plaintiff's knee to return to pre-injury status within three months following surgery" because "there is no 'express temporal requirement as to how long an impairment must last in order to have an effect on the person's general ability to live his or her normal life.'"); *Stapleton v. Auto Club Insurance Assoc.*, 2014 WL 7214680 (Mich. App. 2014) (finding issue of fact to exist even though "more than a year after the accident" "plaintiff's orthopedic spine surgeon noted that her cervical and lumbar spine were normal with no impingement, weakness, or atrophy" because the fact that her spine was "normal more than a year after the accident is not dispositive, as there is not requirement as to how long an important body function must be impaired."); *Blackburn v. Bagley*, 2017 WL 4700024 (Mich.

App. Oct. 19, 2017) (addressing third prong and concluding that "[a]lthough plaintiff was employed at the time of the hearing, her two-year disability alone is sufficient to create at least a question of fact as to serious impairment" as there is no express temporal requirement as to how long an impairment must last in order to have an effect on the person's ability to live his or her normal life.); *Peace v. State Farm Mut. Auto Ins.* Co., 2016 WL 300218 (Mich. App. Jan. 21, 2016) (finding issue of fact as to fourth prong where the "Plaintiff testified that for months after the accident she was unable to work and to perform many of her normal activities" because "[w]hile plaintiff's inability to perform these various task lasted only three months, there is no temporal requirement to establishing a serious impairment of a body function."); *Santelli v. Lionshead Tire and Wheel, LLC*, 2015 WL 12591742 (Mich. App. 2015) (finding third prong met where the plaintiff "spent almost six months away from his home, he was unable to walk or speak during much of that time, and had to undergo extensive physical therapy to regain those functions.").

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Motion for Summary Judgment is DENIED and this action shall proceed to trial.

s/Sean F. Cox                                    
Sean F. Cox
United States District Judge

Dated:  December 11, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 11, 2017, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager